No. 89-434

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

In Re the Marriage of

EDGAR C. SCOTT,

    Petitioner and Respondent,

       v.

CHARLOTTE L. SCOTT,

    Respondent and Appellant.

FILED

'90 DEC 12 AM 11 44

ED SMITH, CLERK
MONTANA SUPREME COURT

APPEAL FROM:  District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable Mark P. Sullivan, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

    Paul N. Cooley, Missoula, Montana

    For Respondent:

    Daniel R. Sweeney, Butte, Montana

Submitted on briefs:  August 23, 1990

Decided:  December 12, 1990

Filed:

Clerk

Justice John C. Sheehy delivered the Opinion of the Court.

Charlotte Loy Scott appeals the dissolution proceeding in the District Court of the Second Judicial District, Silver Bow County. We reverse and remand.

The parties raise the following issues on appeal:

1. Whether the District Court erred in not ordering the sale of the family residence?

2. Whether the District Court erred in receiving the inventory and appraisement of the Elmer L. Mayhew Estate?

3. Whether the District Court erred in valuing Charlotte's equity in her 1976 Cadillac?

4. Whether the District Court erred in equitably distributing the marital estate?

5. Whether the District Court failed to take into account Edgar's vested benefits under the company pension plan?

6. Whether Edgar failed to disclose all of his Westinghouse savings plan?

7. Whether the District Court failed to account for funds which Edgar applied to marital obligations?

8. Whether the District Court erred in valuing Charlotte's equity in the family home at $39,500?

9. Whether the District Court erred in denying Charlotte maintenance?

Charlotte and Edgar were married in Malta, Montana, on June 14, 1964. Twenty-four years later, on August 22, 1988, Edgar filed a petition for dissolution with the District Court. The couple

2

have four children. At the time of the hearing, however, only Rhonda, was under the age of 18, and thus the issues of child support and custody only concern Rhonda.

Charlotte has a high school education, and has been a housewife during all of the parties' 25-year marriage. Charlotte possesses no real job skills, and would require extensive job training to compete in the current job market. To compound Charlotte's economic woes, she suffers from chronic alcoholism.

The District Court found that Charlotte has admitted "to receiving a devise from her father, Elmer Mayhem's Estate in the amount of $42,000, of which she has spent approximately $34,000 for her living expenses since their separation, which were not reimbursed by petitioner and has assigned to her sister an addition sum of approximately $66,420. from her father's estate." Furthermore, the District Court explained that Charlotte "may be entitled to approximately $400 per month from promissory notes due and owing in her father's estate."

Edgar has a college education, and earns approximately $50,974 a year plus bonuses as an engineer for Westinghouse. He supports Rhonda without financial assistance from his wife. His job with Westinghouse provides him with full benefits, life insurance and a pension. The parties dispute the value of the pension. Charlotte contends the pension plan has a present value of $51,000 that will pay Edgar about $1,400 per month at retirement if he quit working today. Edgar values his pension plan at $18,214. The District Court agreed with Edgar.

3

The District Court found the parties acquired the following real property:

| | |
|---|---|
| Family residence, Butte, MT (FMV) | $140,000.00 |
| Mortgage Balance due | 61,000.00 |
| Equity | $ 79,000.00 |
| | |
| Condominium, Phoenix, Az (FMV) | $ 47,000.00 |
| Mortgage Balance Due | 21,858.00 |
| Equity | $ 25,142.00 |

The District Court awarded the possession and use of the family residence in Butte to Edgar, until Rhonda reached the age of majority, or is otherwise emancipated. At that time the court ordered the residence sold and half of the equity in the family home, as of the date of the decree, turned over to Charlotte. The District Court awarded the Phoenix condominium solely to Charlotte. The District Court suggested that Charlotte sell the condominium to aid in her maintenance.

Next, the District Court found the parties acquired the following personal property during their marriage:

| | |
|---|---|
| Cash in American Federal Savings | $12,800 |
| Petitioner's Westinghouse Retirement | 18,214 |
| Petitioner's Westinghouse Savings Plan | 14,828 |
| Kemper Funds IRA's | 14,230 |
| Stocks | 11,084 |
| Household furnishings | 8,240 |
| 1976 Cadillac | 1,500 |
| 1956 Austin Healey | 500 |
| TOTAL | $81,396 |

The District Court also found the parties incurred the following debts during their marriage:

| | |
|---|---|
| VISA | $ 2,415 |
| J.C. Penney | 368 |
| Dr. Silva - Dentist | 341 |
| Dr. Milanovich - Orthodontist | 1,795 |
| Dr. Charles - Eye Specialist | 345 |
| University Physicians - Eye Specialist | 3,016 |

| | |
|---|---|
| University Hospital | 176 |
| First Citizens Bank - Loan | 2,900 |
| State of Montana Hospital | 1,994 |
| Highland View | 898 |
| A-1 Ambulance | 239 |
| Rocky Mtn Plastic Surgery | 7,026 |
| Butte Pathology | 195 |
| OB GYN | 868 |
| TOTAL | $22,576 |

The District Court applied the parties' cash on deposit in the American Federal Savings and Loan Association in the amount of $12,800, and $4,000 of the parties' Westinghouse stock to the above debts, leaving a balance due of $5,776. The court ordered Edgar responsible for the remaining $5,776.

Based on the above figures the District Court found the net value of the marital estate was $168,738. The District Court then distributed the marital estate as follows:

Petitioner (Edgar)

| | |
|---|---|
| Kemper IRA | $ 7,115 |
| Petitioner's Westinghouse Retirement | 18,214 |
| Home Equity - family residence | 39,500 |
| Petitioner's Westinghouse Savings | 14,828 |
| Household Furnishings | 4,212 |
| 1956 Austin Healey | 500 |
| TOTAL | $84,369 |

Respondent (Charlotte)

| | |
|---|---|
| Kemper IRA | $ 7,115 |
| Condominium in Phoenix | 25,142 |
| 1976 Cadillac | 1,500 |
| Stocks | 7,084 |
| Household Furnishings | 4,028 |
| Home Equity - family | 39,500 |
| TOTAL | $84,369 |

Charlotte testified that she needed maintenance in the amount of $500 per month. The District Court determined that Charlotte was not in need of maintenance in addition to her share of the marital estate.

The District Court awarded custody of Rhonda to Edgar, and granted Charlotte liberal visitation rights. The court did not hold Charlotte responsible for any child support obligations while Rhonda is in the care and custody of her father.

Charlotte now, with different counsel, challenges the District Court's valuation and distribution of the marital estate. Our standard of review is that the District Court's judgment, when based upon substantial credible evidence, will not be altered unless a clear abuse of discretion is shown. In Re the Marriage of Watson (1987), 227 Mont. 383, 387, 739 P.2d 951, 954; In Re the Marriage of Stewart (1988), 232 Mont. 40, 42, 757 P.2d 765, 767. With this standard in mind, we now review the issues presented to this Court.

I

**Whether the District Court erred in not ordering the sale of the family residence?**

Charlotte contends that given her immediate need for housing, at the time of the decree she was living with her sister, it was an abuse of discretion not to order the family home sold. We disagree with Charlotte. The District Court awarded the possession and use of the family home to Edgar until Rhonda "reaches the age of majority, or is otherwise emancipated." The family home is necessary to provide a stable environment for the parties' minor child Rhonda as determined by the District Court.

Next, Charlotte relying on In Re the Marriage of Hereford (1986), 223 Mont. 31, 34-35, 723 P.2d 960, 962, argues that the

6

District Court failed to place a burden on an identifiable party with regards to the eventual sale of the family home. In <u>Hereford</u>, we discussed the problems the parties face when a decree fails to make one party responsible for the sale of the family home:

> The problem in this case is in the drafting of the original dissolution decree. The language "the parties shall cause the said property to be appraised by a qualified appraiser, and placed for sale . . ." is not a model of clarity in drafting. The decree places no specific burden on an identifiable party within any time period. It requires only that someone appraise and list the house. It technically does not even require the house to be sold. The property could be, and has been, listed for years without selling. Yet sales remain within the language, if not the spirit, of the decree. Clearly the decree must be modified to place specific burdens on identifiable parties to get the house sold within a reasonable time.

<u>Hereford</u>, 723 P.2d at 962.

The District Court's order does provide a specific time for the sale of the family home, Rhonda's majority or her emancipation, the order, however, fails to list a specific person responsible for the sale. Rather than remand this issue back to the District Court, we order Edgar responsible for the sale of the property at the time Rhonda reaches her majority or is otherwise emancipated. This revision of the District Court's order complies with our holding in <u>Hereford</u>.

## II

**Whether the District Court erred in receiving the inventory and appraisement of the Elmer L. Mayhew Estate?**

Charlotte claims the District Court abused its discretion when it received the inventory and appraisement of her father's estate without taking testimony to determine its weight and credibility.

7

During the dissolution hearing, the parties disputed the amount of the devise Charlotte renounced from her father's estate. In order to determine the value of the assets renounced by Charlotte, the District Court order Charlotte's trial counsel to file the inventory and appraisement. He filed the inventory and appraisement in compliance with the court order and made no request of a hearing to determine the document's weight and credibility.

The District Court could clearly ascertain from the inventory and appraisement the size of the devise that Charlotte renounced. Contrary to Charlotte's assertion, we see no need for a hearing on the credibility of this document, especially in light of the fact that her own counsel submitted it to the District Court. The District Court, after reviewing the inventory and appraisement, and considering this information with the evidence relating to this matter at the hearing properly concluded that Charlotte had renounced over $66,000 in assets from her father's estate and found she may be entitled to an additional $400 per month still available from her father's estate.

## III

**Whether the District Court erred in valuing Charlotte's equity in her 1976 Cadillac?**

Charlotte purchased the 1976 Cadillac from her father's estate for $450. The car had been driven over 100,000 miles when Charlotte purchased it. As the record reveals, she purchased the Cadillac when the parties, though separated, were still married. At the hearing, Charlotte valued the car at $500. In contrast,

Edgar testified that through his conversation with various automobile dealers, the fair market value of the Cadillac ranged between $800 and $1,800. Edgar valued the Cadillac at $1,500, and the District Court adopted Edgar's value for the car. The record reveals that no written estimates were submitted to the court by either party.

Now, Charlotte claims the District Court's finding is not supported by substantial credible evidence. While it is true the District Court was not given the best evidence on which to base its valuation of the Cadillac, the District Court's determination of the Cadillac's value will stand unless it is not supported by the record. In Re the Marriage of Hurley (1986), 222 Mont. 287, 296, 721 P.2d 1279, 1285; In Re the Marriage of Luisi (1988), 232 Mont. 243, 247, 756 P.2d 456, 459. Upon the review of the record, the District Court's finding is supported by the record. Charlotte cannot now find fault with the District Court's valuation of the Cadillac, when she herself offered no professional estimates of the Cadillac's value at the hearing.

In the alternative, Charlotte claims the car is not part of the marital estate, since she purchased it from her father's estate when the parties were separated. Generally, property acquired during the course of a marriage, belonging to either or both parties however acquired, is part of the marital estate. Luisi, 756 P.2d at 458; See § 40-4-202, MCA. The Cadillac, though purchased by only Charlotte, was bought during the marriage of the

parties, thus making the Cadillac a marital asset distributable by the District Court.

## IV

**Whether the District Court erred in equitably distributing the marital estate?**

The issue before this Court is whether the District Court complied with the provisions under § 40-4-202, MCA, in making the distribution of the marital property in an equitable manner. In In Re the Marriage of Dirnberger (1989), 237 Mont. 398, 401, 773 P.2d 330, 332, we reiterated the longstanding rule that district courts must determine the net worth of the parties in order to properly comply with § 40-4-202, MCA. In Dirnberger, we explained:

> The basic goal is that the court must "finally equitably apportion between the parties the property and assets . . ." In construing this statute, this Court has consistently held that this apportionment must be predicated upon a finding of the net worth of the estate. Only after a finding of net worth can the trial court make an equitable apportionment. The District Court must make complete findings of fact, including assets and liabilities, from which can be established a net worth of the parties. Schultz v. Schultz (1980), 188 Mont. 363, 613 P.2d 1022, and cases cited therein; Cook v. Cook (1980), 188 Mont. 472, 614 P.2d 511. Additionally, "[i]f the District Court's findings and conclusions do not reflect the net worth of the parties' marital assets at the time of the divorce, this Court on appeal cannot determine if the property was equitably divided." Robertson v. Robertson (1979), 180 Mont. 226, 231, 590 P.2d 113, 116.

The District Court findings reveal the parties had assets totaling $185,538 and debts of $22,576. In order to reduce the debts of the couple the District Court ordered that "the parties cash on deposit in the American Federal Savings and Loan Association in the amount of $12,800 and $4,000 worth of the

10

parties' Westinghouse stock should be applied to the payments of these obligations leaving a balance of $5,776. The petitioner shall be responsible for the payment of these obligations . . ." The District Court then found the net worth of the marital estate to be $168,738. Next, the District Court split the value of the marital estate evenly between the parties, the court awarded $84,369 for Charlotte and $84,369 for Edgar.

Charlotte finds fault with the amount of debt the District Court listed in its findings. She maintains the District Court abused its discretion when it blindly accepted Edgar's list of the parties' marital debts. The record does show that the District Court accepted most of Edgar's valuation of the couple's debts. According to Charlotte, Edgar over-estimated the amount of the couple's debt in his proposed findings, making it impossible for the District Court to properly calculate the parties' net worth. As Charlotte correctly notes, without a proper calculation of net worth, this Court cannot determine if the District Court equitably divided the marital estate. Dirnberger, supra. Edgar argues the District Court's findings are based on substantial evidence and thus Charlotte's bare allegations are not grounds for reversal by this Court. To determine if the District Court's findings are based on substantial evidence we must review the disputed list of debts in the District Court's findings.

The first debt in dispute is the VISA bill. At the hearing, and in his proposed findings, Edgar claimed the parties sustained a debt to VISA amounting to $2,415. As seen in the court's

findings, the court accepted Edgar's claim. Charlotte alleges the record supports a different amount and we agree. In his December 21, 1988, answer to interrogatory No. 18, Edgar claimed that the VISA bill was originally $2,476.42 and he paid $2,174.27 leaving a balance still due of $302.15 in September, 1988. However, the VISA bill ballooned up to $2,415 by April, 1989. Edgar claims this VISA debt was incurred between the time interrogatories were answered and the hearing, a period of 7 months. Edgar explained the purchases on the VISA card consisted of marital liabilities such as clothing for the parties' child. Edgar failed to offer, and the court did not request him to produce, any VISA receipts to substantiate his claim that the VISA bill paid exclusively for marital liabilities. We remand the valuation of the VISA debt to the District Court to determine if the VISA charges covered marital liabilities. Presently, the record does not support such a large VISA bill. Edgar must substantiate the $2,415 VISA bill with something more than a mere statement that it was used for clothing for the parties' minor child.

The second debt that Charlotte alleges is not supported by the record is $7,026 to Dr. Stronger of Rocky Mountain Plastic Surgery. In his proposed findings Edgar listed the bill as $7,026. Edgar admitted in his answer to interrogatories, and during the hearing that his insurance medical plan reimburses the doctor or Edgar for at least 85% of the provided medical services. After Edgar submitted his bill of $7,026 to Rocky Mountain Plastic Surgery, the District Court discovered during the hearing that Edgar received

12

an insurance check of $1,900 to cover a portion of the Rocky Mountain Plastic Surgery bill. The court ordered Edgar to apply the $1,900 to the debt, and Edgar agreed to turn the check over to Rocky Mountain Plastic Surgery. Despite this testimony in the record, the District Court's findings do not show a bill of $5,176 ($7,026 minus $1,900), but the whole $7,026 bill, with the $1,900 check conspicuously not deducted from the $7,026 original bill.

Edgar argues that since the District Court absolved Charlotte from paying any of the marital debt, she now has no reason to challenge the trial court's findings on this point. We disagree with Edgar's reasoning. First, in order for the District Court to equitably divide up the marital estate the court needs to know the net worth of the parties. Again, the District Court must make complete findings of fact, including assets and liabilities, from which can be established a net worth of the parties. Dirnberger, 773 P.2d at 332. Here, when the District Court failed to subtract the $1,900 insurance check from the original debt, the court failed to make a proper finding regarding one of the parties' liabilities, and thus the court could not correctly establish the couple's net worth. If the District Court's findings and conclusions do not represent the net worth of the couple's marital assets at the time of their dissolution, this Court on appeal cannot determine if the property was equitably distributed. Vivian v. Vivian (1978), 178 Mont. 341, 344, 583 P.2d 1072, 1074; Robertson v. Robertson (1979), 180 Mont. 226, 231, 590 P.2d 113, 116.

Furthermore, the District Court took $16,800 in the parties' assets to reduce the original $22,576 debt. The District Court may not have chosen to apply these assets to the parties' debt if the debt was less than $22,576. A court cannot equitably distribute property if its calculations are based upon faulty asset and debt figures. Accordingly, we remand to the District Court the valuation of the Rocky Mountain Plastic Surgery debt.

In addition to the Rocky Mountain Plastic Surgery, Charlotte claims that a number of other debts listed in the District Court's findings as unpaid debts were paid by the insurance company before the April, 1989 hearing. Charlotte claims Edgar deceived the court by not applying the insurance reimbursement checks to the parties' marital medical debts. Charlotte's allegations are supported by insurance records that her appellate counsel discovered after the District Court hearing, and now seeks to introduce them for the first time on appeal. Unfortunately, however, this Court cannot accept the insurance company records as evidence of Edgar's true debt since they were not introduced first in the District Court. This Court will not consider evidence extraneous to the record. Section 3-2-204, MCA; Downs v. Smyk (1979), 185 Mont. 16, 24, 604 P.2d 307, 312; In Re the Marriage of Stout (1985), 216 Mont. 342, 351, 701 P.2d 729, 735. Section 3-2-204(5), MCA, states in pertinent part:

> In equity cases and in matters and proceedings of an equitable matter, the Supreme Court shall review all questions of fact arising upon the evidence presented in the record . . .

14

Accordingly, we may not consider the insurance company records since they were not introduced first in the District Court. They may be considered on remand.

V

**Whether the District Court failed to take into account Edgar's vested benefits under the company pension plan?**

Charlotte maintains the District Court failed to take into account Edgar's vested benefits under the Westinghouse pension plan, primarily because Edgar never disclosed then. In interrogatory No. 60, Charlotte asked Edgar, "Do you participate in any pension program in connection with your employment?" Edgar answered affirmatively, and allegedly attached the pension plan booklet to his interrogatories. Charlotte claims she never received the pension booklet, and only obtained the pension booklet by subpoena after the entry of decree in preparation for her motion for a new trial. In his answer to interrogatory No. 67, Edgar claimed the pension plan amounted to $18,214. This figure was later adopted in the District Court's findings as "Petitioner's Westinghouse Retirement."

Charlotte now claims Edgar failed to specify the "vested matching contributions" portion of the pension plan in his answer to her interrogatory requests. Edgar maintains that he complied fully with Charlotte's discovery requests, and supplied all the requested information, including the pension booklet. According to Edgar, the interrogatories were placed into evidence by Charlotte without the booklet attached. Edgar argues if the

15

pension booklet was not received prior to the final hearing, her trial attorney would have noted this oversight. There is no such objection by Charlotte's counsel in the record.

Furthermore, Edgar claims the amount of the pension plan or the number of pension plans were never contested by Charlotte in the District Court and she never presented any argument which conflicted with Edgar's pension valuation. Edgar relying on Rule 52, M.R.Civ.P., argues that the trial court made a finding based on substantial credible evidence presented at the hearing and it must be upheld by this Court. We agree the time for Charlotte to raise contentions regarding the pension plan was at the District Court. The District Court's finding is supported by substantial credible evidence in the record and will not be overturned on appeal. Stewart, 757 P.2d at 76; Watson, 739 P.2d at 951. However, in view of the remand here, the issue may be reviewed in the District Court.

VI

**Whether Edgar failed to disclose all of his Westinghouse savings plan?**

Edgar claimed in his proposed findings that his employee savings plan totaled $14,828, and this figure was later adopted by the District Court. After the hearing, via subpoena, Charlotte discovered that Edgar's Westinghouse savings plan allegedly amounted to over $24,000, not the $14,828 claimed by Edgar. Charlotte contends Edgar purposely excluded an "after tax account" and a "401(k) account" from the District Court. Edgar claims he

properly complied with Charlotte's discovery requests, and presented the savings plan information supplied to him by Westinghouse. Furthermore, he claims that Charlotte's exhibit showing the alleged extra savings plans is dated August 2, 1989, several months after the final hearing, and therefore it has no bearing on the June 9, 1989 District Court order.

The District Court's finding of $14,828 in the Westinghouse Savings plan was supported by the evidence presented to the court. We will not reverse the finding with evidence that lists the alleged status of the savings plan several months after the District Court hearing.

Accordingly, we find the District Court's findings regarding the savings plan are based upon the substantial credible evidence in the record. Stewart, 757 P.2d at 767; Watson, 739 P.2d at 954.

VII

**Whether the District Court failed to account for funds which Edgar applied to marital obligations?**

In June 1988, Charlotte was involved in a car accident, from which she was later sued. Edgar worried about the couple's liability in the lawsuit, forged his wife's name, and withdrew $25,884 from the couple's cash account at D.A. Davidson. Edgar then placed one-half of the couple's funds in a joint savings account and placed the rest in a trust account with himself as the trustee. The money in the joint savings account, according to Edgar, was used to pay off marital obligations. When this matter

17

came before the District Court the only money left of the $25,884 D.A. Davidson account was the $12,942 in the trust account.

Charlotte claims Edgar lied to the court, and spent the joint savings account money for his own personal use rather than for marital obligations. At the hearing, Edgar could not present a complete list of marital expenses paid for by the joint savings account, so the District Court requested Edgar to submit an itemized list of expenses paid for with the $12,942 from the joint savings account to substantiate his claims. The record reveals Edgar did submit a list of expenses as ordered by the District Court. Contrary to Charlotte's assertion, the itemized list of expenses supports Edgar's claims that the $12,942 was used to pay marital obligations.

## VIII

**Whether the District Court erred in valuing Charlotte's equity in the family home at $39,500?**

The District Court in its findings valued Charlotte's one-half equity in the home at $39,500, but then ordered that Edgar did not need to pay that amount until Rhonda "reaches the age of majority, or is otherwise emancipated." Charlotte relying on In Re the Marriage of Kis (1982), 196 Mont. 296, 639 P.2d 1151; and In Re the Marriage of Summerfelt (1984), 212 Mont. 332, 688 P.2d 8, argues that the District Court must apply a present value to Charlotte's equity in the house, not one in the future. Charlotte argues the court had an obligation to award interest until 1995 or reduce the wife's awarded equity amount to a present value.

Charlotte's counsel mistakes the meaning of present value, however. A present value determination is necessary where the recipient will be credited for the value of a payment or an object now, but which money or value of an object will be delivered to the recipient in the future. Here, Charlotte was awarded a present equity in the house of $39,500, but will not receive that amount until the house is sold in the future. Since the husband will continue to occupy the house, and in effect enjoy her contribution of $39,500 in equity until the house is sold, it would be more appropriate to provide that Charlotte will receive, when the house is sold, the principal sum of $39,500, plus an appropriate rate of interest per annum until she receives her money.

We remand the issue to the District Court to determine Charlotte's right to interest based on her present equity of $39,500 in the home.

### IX

**Whether the District Court erred in denying Charlotte maintenance?**

Charlotte testified that she needed maintenance of $500 per month, in order to maintain the standard of living achieved during the marriage, and to prevent her from becoming a ward of the State. The District Court determined that Charlotte "is not in need of maintenance in addition to the property division."

In the past, this Court has held that "[g]enerally, the award of maintenance is not favored in states, such as Montana, which have adopted the Uniform Marriage and Divorce Act. The intent of

19

the drafters, as demonstrated by the Commission Comments to § 40-4-203, MCA, indicates a desire to 'encourage the court to provide for the financial needs of the spouse by property disposition rather than an award of maintenance.'" Commission Comments MCA Annotations, Vol. 5, p. 145; Luisi, 756 P.2d at 459; see also In Re the Marriage of Johnsrud (1977), 181 Mont. 544, 572 P.2d 902.

Before a district court can order a maintenance award, the Court must equitably distribute the marital estate. Johnsrud, 572 P.2d at 905. As we stated in Johnsrud, "After the court makes a decision on property division, then any additional needs of spouse petitioning for maintenance should be readily apparent." Johnsrud, 572 P.2d at 905; See also § 40-4-203(1), MCA. As we have previously explained, the District Court must determine the net worth of the parties in order to equitably distribute the marital property in accordance with § 40-4-202, MCA. Here, the District Court must properly apportion the marital estate.

We cannot effectively decide the issues of equitable division of the marital estate and maintenance until the court properly determines the net worth of the parties' estate. Charlotte's need for maintenance can only be determined after the court equitably divides the marital estate. Accordingly, the District Court shall address the issue of maintenance only after it determines the net worth of the parties' estate and makes an equitable distribution of the marital estate.

Reversed.

_____
John C. Sheehy
Justice

We Concur:

_William E Hunter_

_Diane G. Barz_

_R. C. McDonough_

_____
Justices

IN THE SUPREME COURT OF THE STATE OF MONTANA

No.  89-434

In Re the Marriage of

EDGAR C. SCOTT,

     Petitioner and Respondent    )    ORDER

and

CHARLOTTE L. SCOTT,

     Respondent and Appellant.

| | |
|---|---|
| ) | ORDER |
| ) | MODIFYING |
| ) | OPINION |
| ) | |
| ) | |
| ) | |
| ) | |

     The opinion in this cause handed down on December 12, 1990, is hereby clarified and modified by removing the word "Reversed" on page 20 of the slip opinion, and inserting in lieu thereof the words:

     "Remanded for proceedings in accordance with this opinion."

     DATED this 20th day of December, 1990.

FILED

DEC 20 1990

CLERK OF SUPREME COURT
STATE OF MONTANA

_____
_____
_____
_____
_____
                   Justices